Arthur J. Hooks v. Commissioner. W. L. Clayton v. Commissioner.
Hooks v. Commissioner
Docket Nos. 109416, 109427.
United States Tax Court
1944 Tax Ct. Memo LEXIS 132; 3 T.C.M. (CCH) 899; T.C.M. (RIA) 44284; August 22, 1944
*132 John C. White, Esq., 838 Transportation Bldg., Washington, D.C., for the petitioner. James L. Backstrom, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: These cases were consolidated. In Docket No. 109427, the petitioner seeks a redetermination of income tax deficiencies for the calendar year 1937 in the sum of $91,756.09 and $438,251.33 for 1938 and claims overpayment for the calendar year 1938 of $127,192.46. In Docket No. 109416, petitioner seeks a redetermination of an income tax deficiency for the calendar year 1938 in the amount of $37.15. The principal issue involved, and common to both docket numbers, is whether petitioners realized taxable income in 1938 to the extent of accumulated dividends upon and redemption values of new preferred stock and new debentures received from Anderson, Clayton & Co. for old classes of preferred stock surrendered therefor. A second issue is whether the petitioner, W. L. Clayton, is taxable under section 22 (a) or section 167 of the Revenue Acts of 1936 and 1938, for the undistributed income of certain trusts created by him. The proceeding was submitted upon evidence and a stipulation of facts. Findings *133 of Fact The facts are found as stipulated. Petitioner, W. L. Clayton, at all times material herein, was married and residing with his wife, Susan Vaughan Clayton, at Houston, Texas. In 1938, prior to the adoption of the plan whereby old first and second cumulative preferred stock of Anderson, Clayton & Co. (Delaware) (hereinafter called "Corporation") was exchanged for a new kind of preferred stock and debentures, petitioner, W. L. Clayton, owned in community 28,184 shares of no par common stock, 13,569.571 shares of five per cent cumulative first preferred stock and 13,618.317 shares of five per cent cumulative second preferred stock of Corporation. Corporation was organized in 1929 pursuant to a plan of reorganization, to be the parent corporation of Anderson, Clayton & Co., a Texas Joint Stock Association (hereinafter referred to as "Association"). This was believed necessary to permit the stockholders of Association retiring from active participation in the business to retain their stock ownership without remaining personally and unlimitedly liable under Texas law. The stockholders would thus be given a security which they could sell without rendering the purchaser personally *134 liable and the enterprise would have corporate securities not carrying personal liability available to raise additional capital. It was also contemplated that the elimination of personal liability would encourage the ownership of stock by the employees. Association itself was to be continued and the personal liability of the directors actively connected with the management of that business thus retained. Corporation was originally incorporated with an authorized capital of 300,000 shares of $100 par preferred and 105,000 shares of no par common. Two hundred fifty-eight thousand, four hundred twenty-three and 75/100 shares of preferred, having a total par value of $25,842.375 and 52,312.5 shares of common valued at $1 per share, or $52,312.50, were issued in exchange for 34,875 shares of Association's stock. An additional 47,687.5 shares of common were allotted to the managerial employees of Association for subscription at $1 per share. The allotment was made with relation to the amount of the common stock acquired by such employees in the exchange so that the total proposed holding should be fair and equitable and in the best interest of the business. The issuance of preferred stock *135 for practically the full value of the assets and the creation and issuance of a low valued common stock to be held by the managerial employees was expressly designed to permit the capital to receive a specified rate of dividends, while the managerial employees would receive the equity earnings as compensation or remuneration for management. The managerial employees likewise remained, by ownership of shares in Association, fully liable for all the debts and obligations of Association, and representations to that effect were made to bankers and others. It was the plan to gradually shift the responsibility of management and the ownership of the common stock to the younger members of the mangement. This policy was consistently pursued so that from owning 70 odd per cent of the common stock in 1930, the two principal stockholders, petitioner and M. D. Anderson, by transfers to younger members of the management had reduced their ownership of common stock to 45 per cent in 1938. Under date of February 14, 1931, the holders of all the common stock were actively engaged in the business of Corporation. On that date they entered into an agreement with Corporation whereby the shares of common *136 stock were endorsed to M. D. Anderson, as trustee, for a period of 10 years subject to certain conditions. Record title to the stock remained in the beneficial owners who held the receipts of the trustee therefor. The conditions in this agreement may be briefly summarized as follows: "The transfer or assignment of any part or interest except on consent of 75 per cent of the stock held by the trustee was prohibited. "In the event of the death, and also in case of the voluntary or compulsory withdrawal of any shareholder, his shares were to be purchased by the corporation on the basis of a prescribed formula, the aggregate amount which the corporation was required to pay towards the purchase price being limited to $500,000 annually. "With respect to preferred stock held by the estate, heirs, legal representatives or trustees of deceased stockholders whose common stock was held by the trustee, it was provided that any dividend accruing after death and paid in the form of a stock dividend be converted into cash by the corporation buying for cash such stock dividend at par and accrued dividends, if any, at the option of the person or persons to whom such stock dividend was issued. This *137 provision was subject to the limitations of a contract dated March 15, 1930 between Corporation and Benjamin Clayton, which prohibited issuance of corporate obligations payable prior to payment of certain notes issued by Corporation to Benjamin Clayton for stock in Association, such as were given in payment for property not in excess of its actual value at the time of acquisition. The payment of dividends on any class of stock by Corporation was also there prohibited until all these notes given by Corporation to Benjamin Clayton were fully paid, except (1) dividends in junior and inferior securities and warrants; and (2) stock dividends of its own stock. It did not, however, forbid rearrangement of capital or stock structure." This agreement was extended until August 1943. On July 31, 1938 the parties to this agreement owned the following stock of Corporation: Per-
No. of Shares
centage
Common stock
102,856    100    First preferred
175.011
57.262
Second preferred
58,703    68.954
In addition, the Susan Vaughan Clayton Trusts, Nos. 1 and 2, owned 64,015 shares of first preferred stock, or 17.674 per cent of the total, upon which W. L. Clayton was entitled *138 to proxies upon request. Likewise, W. L. Clayton and M. D. Anderson were separately entitled to proxies on a total of 9,341 shares transferred by them to employees. On July 31, 1938, M. D. Anderson owned the following stock of Corporation: Shares
Percentage
Common stock
18,574
18.058
First preferred
144,181
47.175
Second preferred
10,975
12.891
On July 31, 1938, W. L. Clayton owned the following stock of Corporation: Shares
Percentage
Common stock
28,184
27.401
First preferred
13,569
4.440
Second preferred
16,739
19.662 In addition, he was entitled to proxies on the 64,015 shares of first preferred owned by the Susan Vaughan Clayton Trusts Nos. 1 and 2, giving him the right to vote 77,584 shares or 22.114 per cent of the first preferred stock. On July 31, 1938, jointly, W. L. Clayton and M. D. Anderson had the right to vote the following stock: Shares
Percentage
Common stock
46,758
45.459
First preferred
221,765
69.289
Second preferred *
37,055
43.526
Total
305,578
61.905
After July 31, 1938, and prior to the adoption of the plan *139 of alleged recapitalization, W. L. Clayton and M. D. Anderson transferred 6,044 additional shares of second preferred stock in trust for ten-year employees. The stockholders of Association and Corporation immediately prior to and after the organization of the latter were as follows: A.C. & CO., JT. STK. ASSN. SHARES A.C. SEC. CORP. STOCK OUTSTANDING AFTER ORGANIZATION IN MARCH 1930
Holdings as at
Directors
July 31, 1929
Qualifying
Per-
Shs. Retained
Stockholder
Shares
centages
on Reorganization
Benjamin Clayton
16,400
31.970
(a) 1
M. D. Anderson
16,400
31.970
5
W. L. Clayton
16,400
31.970
5
Lamar Fleming, Jr.
700
1.360
5
H. Wittington
400
.780
5
J. P. Fuesler
100
.195
5
C. O. Lamberth
400
.78 D. Sumners
200
.39 E. A. Naman
100
.195
Fred Cockrell
100
.195
J. M. Caine
100
.195
L. L. Fleming
1
D. B. Cannafax
1
TOTALS
51,300
100.000%
28
March 8, 1930
April 21,
Issued in exchange
1930
for shares of AC&Co.
Common
TOTAL COMMON
the Jt. Stk. Assn.
Stock
OUTSTANDING
PREFERRED COMMON
issued
Per-
at $1.00
Per-
Stockholder
Shares
centages
Shares
per share
Shares
centages
Benjamin Clayton
M. D. Anderson
121,487
47.01
24,592 1/2
6,407 1/2
31,000
31.000
W. L. Clayton
121,487
47.01
24,592 1/2
20,207 1/2
44,800
44.800
Lamar Fleming, Jr.
5,150
1.99
1,042 1/2
10,957 1/2
12,000
12.000
H. Whittington
2,927
1.13
592 1/2
4,407 1/2
5,000
5.000
J. P. Fuesler
703.95 .27
142 1/2
52 1/2
195
.195
C. O. Lamberth
2,964
1.15
600
180
780
.780
D. Sumners
1,482
.57
300
90
390
.390
E. A. Naman
741
.29
150
45
195
.195
Fred Cockrell
741
.29
150
45
195
.195
J. M. Caine
* 741
.29
150
45
195
.195
L. L. Fleming
2,500
2,500
2.500
D. B. Cannafax
2,750
2,750
2.75 TOTALS
258,423.95
100.00%
52,312 1/2
47,687 1/2
100,000
100.000%
*140 The list of stockholders of Corporation as of July 31, 1938 was as follows: FIRST PREFERRED
SECOND PREFERRED
COMMON
Per-
Per-
Per-
NAME
Shares
centage
Shares
centage
Shares
centage
M. D. Anderson
144,181
47.175
10,975
12.891
18,574
18.058
W. L. Clayton
13,569
4.440
16,739
19.662
28,184
27.401
Lamar Fleming, Jr.
7,229
2.365
13,788
16.196
17,500
17.014
H. Whittington
4,617
1.511
6,957
8.172
12,500
12.153
D. B. Cannafax
551
.180
5,021
5.898
10,000
9.722
J. P. Fuesler
844
.276
237
.278
276
.268
D. Sumners
774
.254
787
.924
3,750
3.646
Sydnor Oden
55
.018
166
.195
3,750
3.646
S. M. McAshan, Jr.
863
1.014
3,750
3.646
W. L. Anderson
295
.096
371
.436
715
.695
W. H. Koar
374
.439
1,000
.972
F. C. Anderson
295
.096
182
.214
215
.209
J. E. Anderson
295
.096
81
.095
97
.094
J. A. Clapp
275
.090
77
.091
90
.088
Fred Cockrell
165
.194
195
.190
T. A. Davis
4
.005
6
.006
C. T. Donlin
7
.008
10
.010
F. J. Fichter
110
.129
130
.126
Wallace Fleming
8
.009
10
.010
R. C. Fulbright
54
.018
95
.112
18
.018
R. C. Gregg
79
.093
60
.058
C. C. Hightower
9
.010
12
.012
A. N. Hilburn
100
.117
250
.243
W. J. Jung
17
.020
20
.019
C. O. Lamberth
1,702
.557
1,017
1.195
1,164
1.132
C. Mingard
7
.008
10
.010
W. E. Perry
100
.117
250
.243
H. B. Potts
15
.018
20
.019
J. Ross Richardson
275
.090
176
.207
90
.088
C. S. Ruff
85
.100
100
.097
T. O. Schmid
84
.099
100
.097
T. D. Sumners
58
.019
J. E. Waddell
7
.008
10
.010
Ellen Clayton Garwood Trust
18,005
5.891
Susan Clayton McAshan
Trust
18,005
5.891
Anne Burdine Clayton Trust
18,005
5.891
Julia Scott Clayton Trust
18,005
5.891
Susan Vaughan Clayton
Trust #1
30,009
9.819
Susan Vaughan Clayton
Trust #2
24,006
7.855
Guaranty Trust Co., Trusts
(2)
4,414
1.444
Lucy Ellen Johnson, Trusts
(2)
100
.033
42
.049
Various
26,335
30.934
Scrip
14.045
.004
53.586
.063
*141 Total
First Preferred
Shares
305,632,045 Percentage
100.000%
Total
Second Preferred
Shares
85,133.586 Percentage
100.000%
Total
Common
Shares
102,856 Percentage
100.000%
The ownership of the majority stock of Corporation and the control and operation of Corporation and Association from 1930 to 1938, inclusive, were in the hands of M. D. Anderson, W. L. Clayton, Lamar Fleming, Jr., Harmon Whittington, D. B. Cannafax, J. P. Fuesler, D. Sumners, Sydnor Oden and S. M. McAshan, Jr. All of these individuals were managing directors or trustees of Association in 1938. In April 1930, Corporation approved a contract purchasing 16,400 shares of Association stock from Benjamin Clayton, so that, after one share was repurchased by him on July 20, 1930, Corporation owned 51,271 out of the 51,300 shares outstanding. On June 24, 1937, it acquired an additional 515 shares newly issued, and continued to own all but the 29 shares which in 1938 were owned individually by W. L. Clayton, M. D. Anderson, Lamar Fleming, Jr., D. B. Cannafax, Sydnor Oden, J. P. Fuesler, S. M. McAshan, Jr., and D. Sumners, who then constituted the directors of Association. Association was, and is, *142 engaged in the business of merchandising cotton and through numerous subsidiaries in other activties related to the products of the cotton plant, including the storage and compression of cotton. cotton crop financing, ginning, cotton seed milling, manufacture of cotton blankets, manufacture of bagging for cotton, insuring of cotton against fire and like hazards, and the transportation of cotton by barge and truck. In addition to its activities in the United States, the business operated extensively in most of the foreign producing countries, such as Mexico, Brazil, Argentina, Peru, and Egypt. It also controlled a British partnership and a Holland corporation, in addition to its own direct merchandising activities in consuming countries. Because of the general adverse conditions not attributable to management, the earnings from operations of the business to August 1, 1932, were insufficient to offset the depreciation in values resulting from the depression, and some $5,000,000 was written off. Accordingly, the holders of the preferred stock waived preferred cumulative dividends for the two years beginning July 1, 1931 and ending June 30, 1933 and agreed to cut the cumulative rate *143 to 5 per cent with the provision that an additional one per cent per annum would be paid if earnings over the next five years were sufficient after providing $5 per share per annum on the common stock. The certificate of incorporation was amended in October 1933, to reduce the cumulative dividend rate on preferred stock to 5 per cent. In October 1933, the certificate of incorporation was amended to provide for an issue of 100,000 shares of $100 par 5 per cent cumulative second preferred stock. On November 1, 1933, $4,500,407.60 par value of such stock was paid as a dividend on common stock at the rate of $44.60 per share. A similar dividend of $3,553,093.60 par value of second preferred stock was paid on October 11, 1934 at the rate of $35.60 per share. Cash dividends were prohibited by the contract under which the Benjamin Clayton stock was purchased. The stock dividends, in each case, reduced the book value of the common stock to $1 per share at which value it was transferred to younger members of the management as they assumed more responsibility. During 1933-34 W. L. Clayton transferred 3,700 shares of his common stock and M. D. Anderson 4,500 shares of his to such younger members *144 of the management. Likewise, Corporation bought 2,600 shares of common stock from the L. L. Fleming Estate and sold 1,500 thereof at $1 per share to such younger members. Likewise, in 1934-35 Corporation sold the remaining 1,100 shares of Treasury common and 1,950 shares new issue to such younger managerial group. On November 12, 1936, W. L. Clayton sold 7,475 shares of common stock and M. D. Anderson 4,926 shares of such stock to the younger managerial group at $1.12 per share. The stock dividends paid on November 1, 1933 and October 11, 1934 were treated by the stockholders as nontaxable in income tax returns for 1933 and 1934. Respondent claimed deficiencies based on the inclusion of such stock dividends, but the claim was abandoned because of a Supreme Court decision and no tax was paid thereon. At a special meeting of the board of directors, held on October 27, a detailed "Plan of Recapitalization" was adopted. The plan provided for: "Holders of outstanding second preferred will have the option to exchange such stock for debentures of a series maturing 1989/98 bearing 4 1/4 per cent interest, and for new participating 4 per cent cumulative preferred stock or for such new *145 stock alone as follows: Each holder having 100 shares or less may exchange the entire amount for such debentures, or may exchange any part thereof for such debentures and the remaining part for such new stock. Each holder of more than 100 shares may exchange not exceeding the sum of 100 shares and 16 2/3 of shares held in excess of 100 for such debentures and the remaining part of all shares held for such new stock. "Shares of old second preferred stock, depending on date of issue and current value at which redeemable by the corporation, may be exchanged or redeemed for new participating second preferred stock or debentures, as the case may be, at specified rates. "Holders of the outstanding first preferred stock will have the option to exchange one share out of each six shares of such stock held for debentures of a series maturing 1979/88 bearing 4 per cent interest; and will have the further option of exchanging the remaining shares of such stock held, or all of such stock held if none exchanged for debentures, for new participating 4 per cent cumulative preferred stock. "Shares of old first preferred stock, depending upon date of issue and current value at which redeemable *146 by the corporation, may be exchanged for new participating first preferred stock or debentures, as the case may be, at specified rates. "The new preferred stock will bear cumulative dividends from January 1, 1939, and the debentures, interest from the same date." The plan was to become operative only upon the deposit for exchange of all the outstanding first preferred stock and at least 90 per cent of the outstanding second preferred stock. On October 31, 1938, there was mailed to the petitioner, W. L. Clayton, and all other holders of the first and second preferred stock, a letter enclosing a copy of the proposed plan. The letter, inter alia, contained the following: "The principal purposes to be served by the proposed recapitalization are - "(First) To reduce the fixed cost of capital, interest and cumulative preferred dividends. "(Second) To further the purposes of an employees' savings and pension plan, the first steps in which were the transfer of shares of second preferred stock to employees (of subsidiaries of the company) having ten years or more of service, by the two principal stockholders of the company. The purpose in this respect to be served by the recapitalization *147 is to convert the second preferred stock which has been transferred to such employees into securities more suitable for the purpose, such as to give the beneficiaries some assured annual income, and provide a greater degree of security of capital. "(Third) To offer security holders, now holding preferred or second preferred stock, a fair part of the return on their capital in the form of interest, definitely accruing and becoming payable each year. "(Fourth) To provide for a more favorable participation in profits for the common stock, all of which is held by persons active in the management of the business of the company and its subsidiaries, in the event of reduced earnings in the future; and at the same time to offer the holders of the preferred stock a greater participation in any extraordinary gains (as measured in money) which might result from a tendency towards inflation in economic and business conditions, or in a period of substantially higher price levels. "In order to achieve to a maximum extent the second purpose mentioned above, it is provided that each holder of the second preferred stock may exchange up to 100 shares of such stock for debentures. This gives each *148 employee who has received stock upon completion of ten years of service, or his trustees or his heirs, the opportunity to exchange all such stock so received for debentures. The interest due on these debentures, of course, is payable absolutely and prior to any dividends on any class of stock; and in any liquidation the principal of such debentures is payable ahead of any claim of any class of stock. The effect of exchanging second preferred stock for debentures is to convert stock junior to the first preferred stock into a security senior to the first preferred stock. "The advantages to holders of preferred and second preferred stock mentioned as the third and fourth purposes are in consideration of their accepting a lower fixed and cumulative return. * * * * *
"Counsel advise that the plan constitutes a reorganization within the meaning of the Federal Income Tax Law and that the acceptance of the new securities in exchange for the old stock will not give rise to either taxable gain or deductible loss." On November 16, 1938, W. L. Clayton executed and mailed to Corporation a power of attorney authorizing the voting of his shares in favor of the plan and the form agreeing to *149 exchange his stock for new stock and debentures under the plan, and deposited his certificates of stock for that exchange. At a meeting of the board of directors held December 1, 1938, it was reported that 50,938.676 shares of first preferred and 40,711.950 of the second preferred had been deposited and the plan was declared effective. The directors suggested an amendment to the charter reducing the capital by $9,615,062.60, the par value of the shares deposited for exchange. On December 5, 1938, Corporation notified all stockholders of the adoption of the plan by holders of more than 99 per cent of all classes of stock and that a meeting of the stockholders had been called for December 12, 1938 to effect the necessary charter amendment. At a meeting held on December 12, 1938, the stockholders approved the recommendation of its board of directors to reduce the capital stock of Corporation by $9,165,062.60 by retiring 50,938.676 shares of first preferred stock, having an aggregate value of $5,093,867.60, and 40,711.95 shares of second preferred stock of the aggregate value of $4,071,195 owned by Corporation, which had been acquired in exchange for debentures in accordance with the *150 plan. Certificates covering the amendments to the charter were filed and recorded on December 22, 1938. At this meeting that amendment of paragraph "Fourth" of the charter was adopted. The rights, preferences and restrictions governing the various classes of stock were changed by the amendment in the following respects: The new four per cent participating preferred could not be redeemed. Dividends could be declared and paid on the common shares, after mere provision was made for dividends on the preferred stock, whereas, prior to the amendment that liability to preferred had to be paid before common dividends could be declared or paid. Both additional participating dividends on the common and additional participating dividends on the four per cent participating preferred stock could be declared and paid out of a "common surplus" and a "participating preferred surplus" fund set up as provided. There was no similar provision in the old charter. The shares of common stock could not be increased or decreased unless, in addition to the affirmative vote of the majority of common shares and a majority vote of all stock without regard to class, a majority vote of the four per cent participating *151 preferred voted in favor of the change, whereas, prior to the amendment the common could be increased or decreased in the event of an affirmative majority vote of all stock, without regard to class, and the affirmative vote of the majority of the common shares. Upon liquidation, after the discharge of the liability to all classes of stock the common shares and the four per cent participating preferred shares benefit in the same manner and method as is provided with respect to joint participating dividends, whereas, prior to the amendment, both classes of preferred shares were not entitled to participate in the distribution beyond the liability to those shares. All voting rights remained unchanged. No person not previously a stockholder acquired any stock or securities in the exchange. All holders of first preferred stock, and all holders of more than 100 shares of second preferred stock, and some holders of less who so elected, remained holders of new participating second preferred stock. The ownership of the common stock was not affected by the plan. Holders of 100 shares or less of second preferred stock, who exercised the option to exchange such stock entirely for debentures *152 and were thereafter holders of debentures only, held in the aggregate 28,450.531 shares of such second preferred stock prior to the exchange out of a total of 85,133.5864 shares of such stock, 305,632.0456 shares of first preferred and 102,856 shares of common, or a total of 493,621.6320 shares outstanding. Of said 28,450.531 shares of second preferred stock 13,066 shares were held by M. D. Anderson, W. L. Clayton, Lamar Fleming, Jr., H. Whittington, D. B. Cannafax, J. P. Fuesler, S. M. McAshan, Jr., Jas. E. Anderson and J. M. Johnson as trustees for employees under trusts created by said employees. Prior to the creation of the trusts, the stock had been transferred by W. L. Clayton and M. D. Anderson to the grantor employees who had worked 10 years or more for Association or its subsidiaries. Six thousand and forty-four shares were held by J. P. Fuesler, S. M. McAshan, Jr., Syndor Oden, Jas. E. Anderson and J. M. Johnson as trustees under trusts created in 1938 by W. L. Clayton and M. D. Anderson for additional employees who had then attained 10 years' service to Association, its affiliates, or its subsidiaries. The remaining 9,340.531 shares were held by such individuals under *153 agreement with Messrs. W. L. Clayton and M. D. Anderson by whom such stock had been transferred to them, upon condition that it would not be sold or offered for sale or otherwise disposed of during the grantor's (i.e., M. D. Anderson or W. L. Clayton) lifetime without his permission, and that proxies for voting the stock would be delivered to the grantor upon request. Six thousand, nine hundred fifty-nine and 605/1000 of the shares were held by employees of Corporation and its subsidiaries, and 550 by their wives, 1,280.417 were held by relatives and employees of officers, 150 shares by trusts created by Anderson, Clayton & Fleming, and 390,509 shares by the attorneys employed by the enterprise. The market for the old second preferred stock was very limited and unsatisfactory. Prior and subsequent to the exchange the corporation had outstanding: Prior
After
Common stock - no par
102,856 shares
102,856 shares
1951 Debentures 4%
$3,350,000
$3,350,000
1953 Debentures 4%
$2,121,800
$2,121,800
5% 1st Preferred 100 par
305,632.0456 shares
None
5% 2nd Preferred 100 par
85,133.5864 shares
38 shares
4% 1st Preferred
None
273,676.2613 shares
4% 2nd Preferred par & cum.
None
54,594.0634 shares
4 1/4% Debentures 1989/98
None
$5,033,093.14
4% Debentures 1979/88
None
$5,482,512.50
*154 The balance sheets of Corporation according to the books as of December 31, 1938, before and after the execution of the plan, were as follows: ASSETS
Before Exchanges
After Exchanges
Current Assets: Anderson, Clayton & Co., Joint Stock
Association
$ 7,271.04
$ 7,271.04
Notes Receivable
500,000.00
500,000.00
Accrued Interest Receivable
110,942.63
$ 618,213.67
110,942.63
$ 618,213.67
Investments: Long Term Notes of Anderson, Clayton
& Co. Jt. Stock Association
$ 6,156,557.66
$ 6,156,557.66
51,786 Shares of Anderson, Clayton &
Co., a Texas Joint Stock Association
47,201,312.29
$53,357,869.95
46,595,560.26
$52,752,117.92
Other Assets: Deferred Charges
1,681.44
1,681.44
$53,977,765.06
$53,372,013.03
LIABILITIES
Current Liabilities
Notes Payable
$ 485,151.27
$ 485,151.27
Accrued Interest Payable
99,339.85
99,339.85
Accrued Federal Taxes
55,378.08
$ 639,869.20
55,378.08
$ 639,869.20
Long Term Debts
4% Debentures due 1951
$ 3,350,500.00
$ 3,350,500.00
4% Debentures due 1953
2,121,800.00
2,121,800.00
4% Debentures due 1988
0
5,482,512.50
4 1/4% Debentures due 1998
0
5,472,300.00
5,033,093.14
15,987,905.64
Provision for Dividends on Preferred Stock
Second Preferred
$ 1,358,666.00
0
Contingent Dividends
First Preferred
1,484,321.00
Second Preferred
369,116.00
$ 3,212,103.00
0
0
Capital and Surplus
First Preferred Stock
$30,563,204.56
0
Second Preferred Stock
8,513,358.64
4,691.34
Participating 1st Pfd Stock
0
27,367,626.13
Participating 2nd Pfd Stock
0
5,459,406.34
Common Stock
102,856.00
102,856.00
Surplus
5,474,073.66
44,653,492.86
3,809,658.34
$36,744,238.19
$53,977,765.06
$53,372,013.03
*155 The par value of the preferred stock and 1988 and 1998 debentures outstanding after the recapitalization was $43,347,329.45 compared to $39,076,563.20 par value of preferred stock outstanding prior thereto. The $4,270,766.25 increase in the par value of stock and debentures outstanding is the amount of the total dividend which respondent alleges was paid to the stockholders as a result of the transaction. No dividend paid credit was claimed by Corporation in its return for the fiscal year ended July 31, 1939, as a result of or in connection with this transaction. An additional dividend paid credit in the sum of $4,270,766.25 if claimed and allowed, would have reduced the tax liability of Corporation from $21,191.18 to $20,594.53 and would have eliminated the personal holding corporation tax in the sum of $1,806. It would have given Corporation a dividend carry-over in the sum of $4,201,313.58 for succeeding years. The face value of preferred stock and 1988 and 1998 debentures issued, i.e., $43,347,329.45, was equal to the redemption value of the old preferred stock on December 31, 1938, which was par plus accumulated unpaid 5 per cent dividends, and interest and plus an additional *156 5 per cent contingent dividend payable in accordance with the shareholders contract. The earnings of Corporation for 1938 amounted to $3,172,687.51. A dividend on the first preferred stock in the sum of $3,172,687.51, consisting of $2,114,100 in debentures, Series 1953, and $1,058,587.51 in cash, was declared on July 26, 1938 and paid July 31, 1938. This paid all regular 5 per cent cumulative dividends due on such stock to July 31, 1938. Corporation had no income except what it received from Association in the form of dividends and the $1,058,587.51 was all the cash with which it had to pay dividends at July 31, 1938. Corporation's total income from its inception to July 31, 1938 was $18,482,894.76. During the same period it had declared dividends in the amount of $18,576,506.37. Earnings and profits of Corporation for the year ended July 31, 1939, amounted to $810,862.37 and dividends of $762,649.38 on first and second participating preferred stock were declared on July 28, 1939 and paid July 31, 1939. Of this amount $566,200 was paid in debentures and $196,449.38 in cash. Cash dividends of $1,330,003.91 on December 19, 1940 and $1,308,424 on July 31, 1941 were paid on first preferred *157 stocks and on December 5, 1941 a cash dividend of $1,271,220 was paid on the common stock. The following entries were made in the journal of Corporation to record the execution of the plan as well as an adjustment in the value of the assets of Corporation: (1)
Prov. for Cont. Div. on Pfd. Stocks
37
$1,853,437.00
Prov. for Cum. Pfd. Div.
1,358,666.00
Surplus
$1,853,437.00
Surplus
1,358,666.00
Tsfr. to Surplus
(2)
Surplus
64
605,752.03
Investments
605,752.03
Adjust Value as of 7/31/38 - A.C. & Co. J.S.A.
Surplus
65
4,270,766.25
Surplus Capitalized in recapitalization
First Preferred Stock
30,561,900.00
First Preferred Scrip
1,304.56
Second Preferred Stock
8,508,000.00
Second Preferred Scrip
5,358.64
Participating First Pref. Stock & Scrip
27,367,626.13
Participating Second Pref. Stock & Scrip
5,459,406.34
Old Second Preferred Stock
4,691.34
(Par Value $3,800.00)
4% Debentures 1979/88 - and Scrip
5,482,512.50
4 1/4% Debentures 1989/98 - and Scrip
5,033,093.14
To book recapitalization effected Dec. 1938.
The $1,358,666 item "Prov. for Cum. Pfd. Div." was the amount of unpaid, undeclared dividends accumulated on *158 the second preferred stocks as of July 31, 1938. The $1,853,437 item "Prov. for Cont. Div. on Pfd. Stocks" was the amount of additional contingent dividends accrued August 1, 1938, upon the first and second preferred stock under the agreement of shareholders. The $605,752.03 item credited to investments was to adjust the value of the stock owned in Anderson, Clayton & Co. Joint Stock Association to its value as determined by the board of directors and does not relate to the plan here involved. Prior to the recapitalization Corporation had outstanding $39,076,563.20 par value of first and second preferred stock. Unpaid accumulated dividends, which bore so-called interest compounded semi-annually, amounted to $3,212,103 on August 1, 1938 and as of the end of December would amount to approximately $4,200,000. The five per cent upon this total of $43,000,000 plus made the total cost of capital some $2,167,000 per annum. The face value of new preferred stocks which bore four per cent cumulative amounted to approximately $33,000,000 and the accumulative dividends on this plus the interest upon the debentures at 4 and 4 1/4 per cent made an aggregate cost of fixed capital of approximately *159 $1,750,000, a reduction of approximately $400,000 per year. The exchange value of the first and second preferred was computed under the plan by the use of the following schedule: FOR CUMULATIVE FIRST PREFERRED 5% SHARES: $100 PAR VALUE
Outstanding Since
8/1/1933
8/1/1934
8/1/1935
8/1/1936
Par value
$100.00
$100.00
$100.00
$100.00
Accrued unpaid contingent dividend 8/1/1938
5.00
4.00
3.00
2.00
$105.00
$104.00
$103.00
$102.00
Premium equal to dividends at regular and contingent
rates from 8/1/1938 to 12/31/1938 5/12 of 6%
2.625
2.60
2.575
2.55
Total exchange value
$107.625
$106.60
$105.575
$104.55
FOR SECOND PREFERRED 5% SHARES: $100 PAR VALUE
Issued
Prior to
Issued
11/1/1933
8/1/1934
8/1/1935
8/1/1936
Par value
$100.00
$100.00
Accrued unpaid dividend 8/1/1935 to 8/1/1936
$5.0625
0
$105.0625
$100.00
Increase 8/1/1936 to 8/1/1937
5.31878
5.0625
$110.38128
$105.0625
Increase 8/1/1937 to 8/1/1938
5.58805
5.31878
Par and accrued unpaid dividend 8/1/1938
$115.96933
$115.96933
$115.96933
$110.38128
Accrued contingent dividends shares outstanding on
dates in caption hereof
4.75
4.00
3.00
2.00
$120.71933
$119.96933
$118.96933
$112.38128
Premium equal to dividends at regular and contingent
rates from 8/1/1938 to 12/31/1938 5/12 of 6%
3.01798
2.99923
2.97423
2.80953
Total exchange value
$123.73731
$122.96856
$121.94356
$115.19081
*160 All regular dividends had been paid on First 5% cumulative preferred to 8/1/1938, and on Second 5% Preferred to 8/1/1935. First period for contingent or participating dividends on both classes was five years ended 8/1/1938 and had not been paid. On the shares of the petitioner, W. L. Clayton, the accumulated and contingent dividends with the interest and so-called premium were computed as follows: First Preferred Stock
Unpaid Con-
tingent
8/1/1933 to 7/31/1938
$ 66,000.00
So-called
premium
8/1/1938 to 12/31/1938
35,637.71
Second Preferred Stock
Regular & Con-
tingent with
interest
8/1/1936 to 7/31/1938
282,091.28
Regular & Con-
tingent with
interest
8/1/1938 to 12/31/1938
41,081.35
Total
$424,810.34
The total par or face value of the new participating first and second preferred stock and new debentures received by petitioner, W. L. Clayton, for community, under the plan exceeded the par value of the old preferred stock exchanged therefor in the sum of $424,810.34. Pursuant to the plan the petitioner, W. L. Clayton, made the following exchanges: (1) 2,261.595 shares of old first preferred stock from Certificate No. 2 for new 4%, Series 1988 debentures, *161 with a face value of $243,415.47. (2) 2,353.053 shares of old first preferred from Certificate No. 1599 for new 4 1/4%, Series 1998 debentures, with a face value of $291,166.78. (3) 11,307.976 shares old first preferred stock for 12,151.7934 shares of new participating first preferred stock. (4) 11,265.264 shares of old second preferred stock for 13,938.3755 shares of new participating second preferred stock. The new stock certificates and debentures were received by petitioner, W. L. Clayton, on December 29, 1938, and Corporation cancelled the certificates for the old stock surrendered. Additional Facts - Docket 109,416 Petitioner, Arthur J. Hooks, and his wife, Ava T. Hooks, are now, and at all material times have been, citizens of the United States domiciled as husband and wife at Houston, Texas. On December 19, 1935, W. L. Clayton transferred 41 shares and M. D. Anderson 41 shares of the second preferred stock of Corporation (then Anderson-Clayton Securities Corporation) to Arthur J. Hooks who had just completed 10 years service as an employee of Association. The accompanying letter stated that the stock was intended as a personal gift of a part of the interest of the principal *162 stockholders in the institution the employees had helped to create. It was also suggested that the stock be trusteed under a form of instrument enclosed, but this was not done. Under the plan adopted by the board of directors of Corporation, as described in the preceding statement of facts in Docket No. 109,427, Arthur J. Hooks elected to, and did exchange the 82 shares of the five per cent cumulative second preferred stock owned by him, having a par value of $8,200 for 4 1/4 per cent debentures, series of 1989-98, in the face value of $10,115.11. Petitioner reported no gain from the original receipt of the stock in 1935 or the exchange for debentures in 1938. For the years 1936 to 1938, inclusive, the income of the petitioner and his wife, Ava T. Hooks, was reported and tax paid thereon as follows: Husband
Wife
Calendar Years
Income
Tax
Income
Tax
1936
(a) $5,791.74
$108.50
1937
(a) 5,916.26
112.98
1938
(b) 4,230.45
* 106.89
$4,230.44
* $106.89
(a) For years 1936 and 1937 the marital community rendered joint income tax returns. On February 18, *163 1931, W. L. Clayton, as grantor, conveyed to Lamar Fleming, Jr., St. John Garwood and S. M. McAshan, Jr., trustees of a trust hereinafter referred to as the "Susan Vaughan Clayton Trust No. 1," 25,000 shares of the preferred stock of Corporation (community property of himself and his wife) for the benefit of his wife and their daughters, Ellen Clayton Garwood, Susan Clayton McAshan, Ann Burdine Clayton and Julia Scott Clayton. This trust, to be known as the Susan Vaughan Clayton Trust No. 1, contained the following pertinent provisions: * * * * *
"During the life of Grantor said income shall be accumulated by the Trustees, invested in accordance with the terms hereof and added to the corpus of the Trust Estate, provided, however, that upon written direction of Grantor the net income or any part thereof may be paid over to the Beneficiary or Beneficiaries herein named. "From and after the death of Grantor the net income of the Trust Estate shall, from time to time as collected and received, be paid over to the Beneficiary or Beneficiaries herein named. "The primary Beneficiary hereunder is SUSAN VAUGHAN CLAYTON, wife of Grantor, who shall be the sole Beneficiary hereunder during *164 her lifetime and the other Beneficiaries are as hereinafter set forth. * * * * *
"This trust shall continue for a period of twenty (20) years after the death of Grantor, at which time the trust shall cease and determine and the principal and all accumulated income thereof shall be delivered to SUSAN VAUGHAN CLAYTON. "In the event that SUSAN VAUGHAN CLAYTON, primary Beneficiary shall die prior to the expiration of this trust, then at such expiration the principal and all accumulated income thereof shall be delivered to the daughters of Grantor hereinabove named, share and share alike, but in the event that any of said daughters shall die before the termination of this trust and have descendants who shall be living at the termination of this trust, then the principal and all accumulated income in the Trust Estate, shall at that time be distributed in equal shares among said descendants, per stirpes and not per capita; but, in the event any daughter shall have no descendants who are alive at the termination of this trust, then such principal and accumulated income shall at that time be distributed among the then living daughters of the Grantor and the descendants then living of any *165 deceased child of Grantor, such distribution to be per stirpes and not per capita. * * * * *
"Except as hereinafter limited and subject to the convenants herein made by them the Trustees shall have full authority in the management of this trust, with full power and authority to change investments, and to invest and re-invest principal and accumulated income in such stocks, bonds, notes and other property as the Trustees in their discretion shall determine and without respect to whether the same be authorized by law as suitable for the investment of trust funds; provided, however, that during the life of Grantor he shall have the right and power to direct and require the Trustees to sell, barter or exchange any properties included in said trust upon such reasonable terms and conditions as he shall determine and to direct the manner in which the proceeds from any such disposition shall be invested and/or reinvested from time to time and no sales or other disposition of any property or securities in this Trust nor any investment or re-investment of trust funds shall be made by the Trustees except upon and after the written approval of the said Grantor, or his nominee in writing to *166 the said Trustees; and in the event Mrs. Susan Vaughan Clayton, wife of William L. Clayton, shall survive the said William L. Clayton, then, and after the death of William L. Clayton and until her death she shall have a like power as is herein conferred upon and reserved to the said William L. Clayton with respect to the disposition, investment and re-investment of said trust properties or funds, but nothing hereunder shall be construed as giving to Grantor hereunder the right or power to revoke, change or alter the terms of this Trust or to dispose of any of the trust properties by gift, or donation, it being the purpose hereof to permit to the extent hereinabove indicated William L. Clayton in his lifetime and Susan Vaughan Clayton, for the period she shall survive him to exercise discretion as to how the trust funds shall be invested from time to time and as to the sale, barter or exchange of the trust properties, or any part thereof. * * * * *
"The Grantor shall have no right or power to revoke or alter any of the terms or provisions of this trust or the powers, authorities, duties and liabilities of the Trustees." * * * * * The trustees were to act by a majority. Vacancies *167 were to be filled by the grantor or, in case of his failure, by the remaining trustees. The trust was to be administered according to the laws of the State of Texas. Likewise on February 18, 1931, W. L. Clayton executed another trust conveying to the same individuals 20,000 shares of the preferred stock of Corporation. This trust was to be known as the "Susan Vaughan Clayton Trust No. 2." It was identical in terms with Trust No. 1, except power was given to Susan Vaughan Clayton to prescribe in her will that any trust income which would have been payable to her, if living, should be paid to such person as she might designate for the life of such person. At the time of creation of said trusts in February, 1931, W. L. Clayton, grantor, was 51 years of age and Susan V. Clayton was 50 years of age. Of the trustees of said trusts St. John Garwood is the husband of Ellen Clayton Garwood and S. M. McAshan, Jr., is the husband of Susan Clayton McAshan, and throughout the years 1937 and 1938 both resided in Houston, Texas, with their wives. During the year 1937 the net income of Trust No. 1 was $157,672.69, which was returned by the trustees as income of the trust, and an income tax of *168 $69,910.65 was paid thereon. During the year 1937 the net income of Trust No. 2 was $133,198.89, of which the trustees distributed the sum of $6,900 to Susan Vaughan Clayton. The trustees reported as income of the trust the sum of $126,298.89 and paid a tax of $50,089.75 thereon. The amount distributed to Susan Vaughan Clayton was received and used by her for her separate use and subject to her own discretion. During the year 1938 the net income of Trust No. 1 was determined by the trustees to be $316,885.08, and the net income of Trust No. 2 was determined by the trustees to be $263,562.85. This did not include any income from the exchange of the five per cent first preferred stock of Corporation for new participating first preferred and debentures in the recapitalization. Prior to the exchange hereinabove described the Susan Vaughan Clayton Trust No. 1 owned 30,009.344 shares of the five per cent cumulative first preferred stock of Corporation. Under the plan described, it exchanged in December 1938, 5,001.557 shares of such stock for $538,317.58 par value of 4 per cent debentures, Series of 1979/88, and 25,007.787 shares for 26,872.0391 shares of the new 4 per cent participating *169 first preferred stock. The trustees of the said trust determined that under Article 2 of the trust all of the securities received as a result of such exchange constituted principal of the trust. Prior to the exchange hereinabove described, the Susan Vaughan Clayton Trust No. 2 owned 24,006.824 shares of the five per cent cumulative first preferred stock of Corporation. Pursuant to the plan described, it exchanged 4,001.137 shares of such five per cent stock for $430,642.38 face value of 4 per cent debentures, Series of 1979/88, and 20,005.687 shares for 21,497.0197 shares of the new 4 per cent participating first preferred stock. The trustees of the said trust determined that all of the securities received as a result of such exchange constituted principal of the trust. The exchanges in the recapitalization were made pursuant to the written authority given by W. L. Clayton in his letter of November 9, 1938. During the year 1938 the trustees of Susan V. Clayton Trust No. 1 distributed to the beneficiary $130,000 face value of 1953 series debentures received on July 31, 1938, by said trust as dividends on the first preferred stock of Corporation, and likewise the trustees of Susan *170 V. Clayton Trust No. 2 distributed to the beneficiary $75,000 face value of 1953 series debentures received on July 31, 1938, by said trust as dividends on the first preferred stock of Corporation. Mrs. Clayton had full control of the debentures after they were distributed to her. She sold part of them, gave away some to her relatives, and retained part of them. Stocks and bonds owned by her were issued or registered in her name and kept in a personal safety deposit box. Interest and dividend check proceeds were disposed of by her or at her direction. The taxable income and tax liability of W. L. Clayton and Mrs. Susan Vaughan Clayton for the years 1931 to 1938, inclusive, was as follows: W. L. Clayton
Mrs. Susan V. Clayton
Year
Taxable Income
Final Tax
Year
Taxable Income
Final Tax
Determined
Liability Deter-
Determined by
Liability Deter-
by Bureau of
mined by Bureau
Bureau of In-
mined by Bureau
Internal Revenue
of Internal Rev.
ternal Rev.
of Internal Rev.
1931
$ 30,119.31
$ 1,335.00
1931
$ 30,119.31
$ 1,335.00
1932
44,864.16
7,076.52
1932
44,864.16
7,076.52
1933
107,884.62
34,381.95
1933
116,969.76
39,469.63
1934
51,461.70
9,047.28
1934
57,461.69
11,093.63
1935
89,429.04
24,870.17
1935
89,429.04
24,870.17
1936
67,941.71
15,996.86
1936
67,941.71
15,996.86
1937
* 111,331.95
* 40,093.20
1937
* 111,331.94
* 40,093.21
1938
* 4,720.06
* 46.63
1938
* 4,720.06
* 46.63
*171 In the creation of both of the trusts above mentioned the petitioner grantor retained such a "bundle of rights" as to be the equivalent of ownership in the corpora or income therein. Opinion The first issue, and which is common to all proceedings, is whether the petitioners, stockholders of Corporation, realized taxable income in 1938 when the exchange was effected under the plan changing the capital structure of Corporation. Under the plan, accepted by the holders of over 99 per cent of the outstanding capital stock of Corporation and put into effect, the following changes in the capital structure resulted: $30,563,204.56 and $8,513,358.64 par value 5% cumulative first preferred and second preferred shares, respectively, were exchanged for $27,367,626.13 and $5,459,406.34 par value of new 4% participating first and second preferred shares, respectively, together with debentures due 1979/88 in the face amount of $5,482,512.50 and $5,033,093.14, respectively. All of its old 5% first preferred stock and all but 38 shares of its old 5% second preferred stock was thereby eliminated. *172 Book surplus was reduced by $4,270,766.25, representing undeclared accrued dividends and additions due on both classes of preferred stock. The 102,856 shares of common stock of the par value of $1 per share were not involved in th plan. On December 22, 1938 a certificate of reduction of the capital stock was duly filed reducing capital by the sum of $9,165,062.60. This reduction was accomplished by retiring 50,938.676 shares of 5% cumulative first preferred shares and 40,711.95 shares of 5% cumulative second preferred stock, or a total of 91,650.626 shares of the par value of $100 each. The petitioner, W. L. Clayton, under the plan, exchanged 13,569.571 shares of 5% cumulative first preferred stock and 13,618.317 shares of 5% cumulative second preferred, of a total par value of $2,718,788.80, for 12,151.7934 shares of 4% participating first preferred stock and 13,938.3755 shares of 4% participating second preferred stock of a total par value of $2,609,016.89 and 4% debentures of the face value of $243,415.47 and 4 1/4% debentures of the face value of $291,166.78, a total value of $3,143,599.14. The total par value of the new preferred stock and debentures received by the petitioner *173 in exchange exceeded the par value of the two classes of old preferred stock by $424,810.34, which was the exact amount of the accumulated undeclared dividend in arrears on the preferred stock as of December 31, 1938, plus interest thereon as provided in the corporate charter. The respondent increased petitioner's gross income by one-half of the $424,810.34, community property, or $212,405.17, as a distribution by the corporation of taxable income. The petitioner, W. L. Clayton, contends that his exchange of his old 5% preferred stock for new 4% preferred stock and debenture bonds occurred in pursuance of a plan of reorganization within the definition of section 112(g)(1)(D) of the Revenue Act of 1938, here controlling, and was therefore nontaxable under section 112(b)(3) of the same Revenue Act. The Supreme Court in Helvering v. Southwest Consolidated Corp., 315 U.S. 194, at page 202, defines a recapitalization as a "reshuffling of a capital structure within the framework of an existing corporation". Respondent concedes, as we think he must, that what occurred here satisfies that definition. He argues, however, that there are three additional tests *174 which the structural change here does not meet and thus fails to satisfy the requirements of the term "recapitalization" as used in section 112(g)(1)(D) cited supra. These additional tests are: (a) that it be motivated by legitimate business purposes; (b) that it be necessary to strengthen the financial structure of the corporation and (c) that as a result of the recapitalization the stockholders have substantially the same interests in the corporation as before. Respondent cites as his authority for applying these tests excerpts from a Report of the Ways & Means Committee of the House of Representatives which accompanied the Revenue Act of 1934. [1]
*175 Without recourse to any other authority it is, of course, now well established that to qualify as a reorganization within section 112(g)(1), the reorganization must serve a reasonable business purpose, Gregory v. Helvering, 293 U.S. 465, and that requirement applies whether the reorganization be by way of recapitalization or otherwise. LeTulle v. Scofield, 308 U.S. 415; Annis Furs, Inc., 2 T.C. 1096. [2] What does this record reveal on that score? The recapitalization here was intended to and did: (1) reduce the fixed interest and dividend charges of the corporation from $2,167,000 to $1,750,000; (2) eliminate undeclared but accumulated dividends of $3,212,103 without affecting the cash position of the corporation; (3) reduce the carrying charges on the accumulated but undeclared dividends; (4) relieve the corporation of the contingent liability of retiring about $5,800,000 worth of preferred stock, about $1,000,000 of which would have been incurred in August 1939 upon the death of M. D. Anderson; (5) improve the position of *176 the employees' trusts by permitting a limited substitution of debenture bonds providing a definite interest income, backed by $30,000,000 of preferred stock, for their old second preferred stock with a very limited and unsatisfactory market and with $30,000,000 of first preferred stock ahead of it; [3] (6) provide the capital as distinguished from the management interests with a preferred stock which was not only not callable but had the right to share in unusual earnings resulting from inflation, and a small proportion of debenture bonds providing an assured income; (7) provide desired and desirable financial encouragement to the management by increasing the possibility of cash dividends on their common stock - a possibility which actually materialized in 1941 in the form of a cash dividend of $1,271,220. These purposes and accomplishments, we think, were amply sufficient to bring the recapitalization within the purview *177 of a "reorganization". Commissioner v. Kolb, 100 Fed. (2d) 920, cited with approval at 1 T.C. 59; Skenandoa Rayon Corp., 42 B.T.A. 1287; affd., 122 Fed. (2d) 268; Annis Furs, Inc., supra;Clarence J. Schoo, 47 B.T.A. 459; J. Weingarten, Inc., 44 B.T.A. 798; South Atlantic Steamship Line, 42 B.T.A. 705; Elmer W. Hartzel, 40 B.T.A. 492. Moreover, the plan of recapitalization clearly meets respondent's other two tests. In this connection it must be remembered we are considering a "recapitalization". That term is here to have "a broad rather than a restricted meaning". Commissioner v. Neustadt Trust, 131 Fed. (2d) 528. There was here no transfer of assets - no sale lurking in disguise. It is true the corporation was not in bad financial condition. Its condition was good. But that fact is no bar to a "recapitalization". See South Atlantic Steamship Line, supra; *178 Skenandoa Rayon Corp., supra;J. Weingarten, Inc., supra;Charles J. Schoo, supra;Commissioner v. Neustadt Trust, supra;Edgar M. Docherty et al., 47 B.T.A. 462; Lelia S. Kirby, 35 B.T.A. 578; affd., 102 Fed. (2d) 115; Annis Furs, Inc., supra.The elimination of its accumulated but unpaid dividends, the reduction of its fixed interest and capital charges and the elimination of its contingent liability to retire more than $5,000,000 of preferred stock - all without distrubing its cash position - certainly improved the corporate financial condition. That was enough. Commissioner v. Neustadt Trust, supra;Annis Furs, Inc., supra. After the exchange, the holders of all the old first preferred stock were holders of all the new participating first preferred stock; the holders of all the old second preferred stock, except those owning in the aggregate an interest of less than.05 in the corporation, became *179 holders of the new second participating preferred stock. The fact that the holders of that very small interest elected to receive the long-term debentures in exchange for their preferred stock and thus ceased to be stockholders is of no consequence here. Miller v. Commissioner, 84 Fed. (2d) 415; J. Weingarten, Inc., supra.There was no charge in the holdings of the common stock. There were no new stockholders. Corporate control remained as before. Thus, we think it is beyond question that, under the decided cases, there existed here the necessary continuity of interest without substantial change in the original investment of the stockholders of the corporation. Helvering v. Southwest Consolidated Corp., supra;Commissioner v. Neustadt Trust, supra;Skenandoa Rayon Corp., supra;Charles J. Schoo, supra;Annis Furs, Inc., supra;Edgar M. Docherty et al., supra;J. Weingarten, Inc., supra;Lelia S. Kirby, supra. *180 Having thus concluded that this change in the capital structure of Corporation was a "recapitalization" within the meaning of that term as used in section 112(g)(1)(D), supra, and therefore a "reorganization", it would follow that petitioner's exchange of his preferred stock for new preferred stock and long-term debenture bonds was non-taxable under the provisions of section 112(b)(3) of the Revenue Act of 1938. Here, however, we are met by respondent's alternative argument that "payment of the accumulated dividends was a separate transaction from any plan of recapitalization". Thus he argues that a part of the new preferred stock and/or bonds was received in exchange for the accumulated undeclared dividends on the old shares and is therefore taxable as a dividend to petitioner under sections 115(a) and (g) of the Revenue Act of 1938. [4]
*181 The argument that the transaction is divisible into a "reorganization" and a payment taxable as a dividend, is not sound. Although in no sense controlling, it may be worth noting that though dividends had accured on the preferred stock, they had not been declared. Not only is this so, but there is no indication that such was intended. The plan and the other facts show that the petitioners merely exchanged their old preferred stocks for new preferred stocks and long-term debentures. That the exchange value of the old preferred stock was computed by including therein the amount of the accrued but undeclared dividends, together with interest thereon, is in no sense decisive. The articles of incorporation of the corporation provided for that valuation. In recording the effect of the recapitalization on its books, Corporation after crediting surplus with the amounts of "Provision for Accumulated Dividends" charged to surplus the difference of $4,270,000 excess of the par value of new stock and debentures over that of the old stock exchanged therefor. This surplus was a book surplus and not earned. This is disclosed by the fact that as of July 31, 1938 the earnings of Corporation to that *182 time were $18,482,894.76 and that dividends had been paid in the same period of $18,576,506.37. The earnings for the year ending July 31, 1939 were $810,862.37 and dividends paid thereon in the same interval were $762,649.38. But even if it were otherwise and such item had been charged to earned surplus, the situation here would not be affected. Commissioner v. Kolb, supra;J. Weingarten, Inc., supra.In short, we think the transaction was not separable. It was a reorganization in which the petitioner, W. L. Clayton, exchanged preferred stock for preferred stock and long-term debentures in the same corporation, which section 112(b)(3), supra, decrees shall be tax-free. This conclusion effectively disposes of respondent's argument that the accumulated but undeclared dividends are taxable to petitioner under either section 115(a) or section 115(g). The effect of sections 115(a) and (g) is limited by subsection 115(h). The latter subsection provides that a distribution by a corporation of its stock or securities shall not be a distribution out of earnings or profits if no gain to the distributee from the receipt of the *183 stock or securities is recognized by law. We have already decided that because of section 112(b)(3) the exchange of his old preferred stock for new preferred stock and debentures was taxfree. It follows therefore necessarily that the preferred stock and long-term debentures received by the petitioner in the exchange were not a dividend under section 115(a) nor "essentially equivalent to the distribution of a taxable dividend" under section 115(g). South Atlantic Steamship Line, supra;Charles J. Schoo, supra.We hold that respondent erred by including any amount in income of the petitioner, W. L. Clayton, for 1938, because of this exchange. The petitioner, Arthur J. Hooks, was one of the holders of less than 100 shares of old second preferred stock. Under the plan he exchanged his stock for 50/60 year debentures. This class of stockholders held 28,450.531 shares of old second preferred stock which was less than six per cent of the 493,621.6320 shares of all classes of stock outstanding, and represented an interest of less than 1/2 of 1% in the corporation. Nineteen thousand odd shares of this stock were held in trust for employees. *184 Respondent argues that this petitioner and others of this class who exchanged their old preferred stock for debentures fall into a different category. Thus it is said, since they lost their stockholder status, they retain no continuity of interest and the reorganization on the basis of the Revenue Act had no application. The respondent's position is untenable. We have already concluded that there was a recapitalization organized as a reorganization under the provisions of section 112(g)(1), supra, despite the fact that petitioner and others of his class of stockholders, owning an interest of less than 1/2 of 1% in the corporation, exchanged their old preferred stock solely for long-term debenture bonds, thus losing their stockholder status. That being so, section 112(b)(3), is applicable. It is there provided in the disjunctive that "No gain or loss shall be recognized if stock or securities * * * (is) exchanged solely for stock or securities in such corporation * * *". Here petitioner Hooks and others of his class of stockholders exchanged old preferred stock for 50/60 year debenture bonds. That these bonds were "securities" within the Act is not and can not be contradicted. *185 South Atlantic Steamship Line, supra;Charles J. Schoo, supra;Commissioner v. Neustadt Trust, supra;Commissioner v. Kolb, supra.We conclude that respondent erred by including any gain in 1938 to petitioner Hooks based on his exchange of old preferred stock for lebenture bonds. The remaining issue raised in the pleadings in Docket No. 109427 is whether the petitioner, W. L. Clayton, is taxable on the 1937 and 1938 income of the two trusts under section 22(a) of the Revenue Acts of 1936 and 1938. [5] The respondent makes no argument that petitioner is taxable under section 167 of the Revenue Acts for those years. *186 The respondent contends that the petitioner is taxable on this contested income under the rule announced in Helvering v. Clifford, 309 U.S. 331 [40-1 USTC [*] 9265], and cognate authorities. We regard this case as near the border line of that rule and, therefore, not easy of a correct solution. No beneficial result would flow from any attempt here to review the innumerable decisions applying and distinguishing the principles and facts emphasized by the various courts in applying the principles of the Clifford case, supra. To attempt to analyze and reconcile them would tax the ingenuity of the mind. It seems to us that one common principle is that where the trust is for a family group the instrument must be closely scrutinized to ascertain whether the grantor has so far reserved dominion over the corpus and income that he remains the owner for purposes of taxation. The corpora of these trusts comprised in the aggregate 45,000 shares of the preferred stock of Clayton, Anderson & Co., in which the grantor was vitally interested both financially and otherwise. These shares were the community property of the grantor and his wife, *187 the primary beneficiary of the trusts. The trusts were to terminate 20 years after the death of the grantor. The right and power to revoke or alter any of the terms and provisions of the trusts was specifically denied. The grantor was not named as a trustee. While the trustees were given full authority in the management of the trusts they were nevertheless forbidden to make any sale or other disposition, or to invest and reinvest the trust funds without the direction or the approval of the grantor and, after his death, that of his wife. Thus the grantor was the equivalent of sole trustee insofar as the corpus of the trusts was concerned. The trust instruments directed that the income of the trust corpora was to be accumulated and added to the corpus during the grantor's life, but they contained a proviso "that upon the written direction of the Grantor the net income, or any part thereof, may be paid over to the Beneficiary or Beneficiaries." Two of the trustees named were sons-in-law of the grantor and the third was a business associate. It may be doubted, therefore, whether those trustees would exercise any independent discretion respecting the distributions of the income if the *188 grantor directed its payment. The record shows that income from these trusts was distributed to the grantor's wife in 1937 and 1938. Where trusts are to continue for a long time, such as is true here, extensive administrative powers over the corpus of a trust for the benefit of a family group, where the grantor reserves no right to revoke, alter or revest either corpus or income, may not, standing alone, require the income to be taxed to him under section 22(a) of the Internal Revenue Code. Armstrong v. Commissioner, ( 10 C.C.A. July 6, 1944). But we have recently held in the case of Louis Stockstrom, 3 T.C. 255 (on appeal to 8 C.C.A.), involving a long term trust, that where broad administrative powers over the corpus are coupled with power retained by the settlor to pay to or withhold from the named beneficiaries the income of the trust, a sufficient economic advantage is retained by the grantor to justify taxing the income of the trust to him within the principles of the Clifford case, supra. We see no valid distinction between the facts in that case and those in the case at bar. On the authority of the Stockstrom case, supra, *189 we sustain the respondent on the trust issue. Cf. George v. Commissioner, 143 Fed. (2d) 837. In Dockets No. 109416 and 109427, decisions will be entered under Rule 50. Footnotes
*. Including the above mentioned 9,341 shares transferred subject to proxy rights.↩
(a). Repurchased by Benjamin Clayton on July 20, 1930. ↩
*. Issued to the Estate of J. M. Caine (deceased March 18, 1930, while organization was in process. Later sold 1/3 each to J. E. Anderson, F. C. Anderson and W. L. Anderson.)↩
*. Year 1938, involved in this proceeding. These figures are as reported in separate returns.↩
*. Years 1937 and 1938 involved in present proceeding. These figures are as reported in returns.↩
1. Report of Ways and Means Committee (73rd Cong., 2d Sess., H. Rept. 704, p. 14) relating to the 1934 Act: * * * (Section 112 (g)(1) will limit reorganizations to (1) statutory mergers and consolidations; (2) transfers to a controlled corporation, "control" being defined as an 80 per cent ownership; and (3) changes in the capital structure or form of organization. By these limitations the committee believes that it has removed the danger that taxable sales can be cast into the form of a reorganization, while at the same time, legitimate reorganizations, required in order to strengthen the financial condition of the corporation, will be permitted. Furthermore, the retention of the other reorganization provisions will prevent large losses from being established by bondholders and stockholders who receive securities in a newly organized enterprise which are substantially the same as their original investments.↩
2. Com. acquiesced, Int. Rev. Bull. No. 6, Mar. 25, 1944.↩
3. That the right to make this exchange was advantageous to the old second preferred stockholders is evidenced by the fact that all the employees' trusts holding that stock and practically all individual stockholders exercised it, so far as possible under the plan.↩
4. SEC. 115. DISTRIBUTIONS BY CORPORATIONS. (a) Definition of Dividend. - The term "dividend" when used in this title (except in section 203 (a) (3) and section 207 (c) (1), relating to insurance companies) means any distribution made by a corporation to its shareholders whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. (g) Redemption of Stock. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.↩
5. SEC. 22. GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. In the case of Presidents of the United States and judges of courts of the United States taking office after June 6, 1932, the compensation received as such shall be included in gross income; and all Acts fixing the compensation of such Presidents and judges are hereby amended accordingly.↩